# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MARYLAND
### (Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | (Chapter 11) |
| | | Case Nos. 06-12769 (PM) and |
| **MASTERCRAFT INTERIORS, LTD.** | * | 06-12770 (PM) |
| **KIMELS OF ROCKVILLE, INC.,** | | |
| | * | |
| Debtors. | | Jointly Administered |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| **BRADFORD F. ENGLANDER**, | * | |
| In his capacity as Plan Administrator for | | |
| Mastercraft Interiors, Ltd., and Kimels of | * | |
| Rockville, Inc., | | |
| | * | |
| Plaintiff, | | Adv. Proc. No. 08-0424 (PM) |
| | * | |
| v. | | |
| | * | |
| **DOUGLAS GOMEZ**, *et al.,* | | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MOTION FOR LEAVE TO FILE APPEAL

Bradford F. Englander ("Plan Administrator" or "Plaintiff"), in his capacity as Plan Administrator for Mastercraft Interiors, Ltd., and Kimels of Rockville, Inc. (together the "Debtors"), by counsel, files this motion (the "Motion") for leave to file an appeal of the order (Paper Number 51) (the "Order") supported by the memorandum opinion (Paper Number 52) (the "Opinion")[1] entered on December 16, 2008 by the clerk of the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court") pursuant to Federal Rules of Bankruptcy Procedure 8001(b) and 8003 and 28 U.S.C. § 158 and states:

## PRELIMINARY STATEMENT

By the Order, the Bankruptcy Court granted the motion to dismiss (the "Motion to Dismiss") filed by Douglas Gomez and Carolyn Gomez and dismissed Counts XI (negligence) and XII (gross negligence) of the Amended Complaint against Douglas Gomez, Carolyn Gomez, Dean Nelson and Carole Nelson[2] (together the "Defendants").

The Defendants are former officers, directors and persons in control of the Debtors.  The Plaintiff is the duly appointed successor and representative of the Debtors' estates pursuant to the confirmed Amended Joint Plan of Liquidation and is authorized to prosecute causes of action on behalf of the Debtors.

Pursuant to the Amended Complaint, Plaintiff alleges claims against the Defendants for negligence (Count XI) and gross negligence (Count XII).  By these counts, Plaintiff seeks to recover for damage the Defendants inflicted upon the corporation; not for damage that the Defendants inflicted upon the Debtors' consumers.  The Defendants' actions  (including the decision to obtain involuntary consumer deposit financing) were the proximate cause of severe damage to the corporation including increased staffing costs, legal fees, costs of the ensuing bankruptcy cases and additional rent.  The Defendants did not act in the Debtors' interest.  The Defendants used consumer deposits in order to fund numerous family salaries, preferential prepayment of personal loans and reduction of their personal guaranty liability.

---

[1] A copy of the Order and Memorandum Opinion is attached to this Motion at Exhibit A.
[2] At the hearing on the Motion to Dismiss and opposition thereto, the Bankruptcy Court granted the oral motion of the Defendants Dean Nelson and Carole Nelson to join in the Motion to Dismiss.  *Opinion*  at 1.

The Bankruptcy Court dismissed Counts XI (negligence) and XII (gross negligence) of the Amended Complaint on two grounds.[3]  First, the Bankruptcy Court dismissed Counts XI and XII on the ground that the Plan Administrator lacked standing to bring the claims.  The Bankruptcy Court reasoned that claims against the Defendants for defrauding consumers belonged to consumers, not to the Debtors' estates or the Plan Administrator.  If the Plan Administrator were seeking to pursue the claims of consumers, the Bankruptcy Court's conclusion would be correct.  However, under the Amended Complaint the Plan Administrator is not seeking to recover for damage to consumers.  The Plan Administrator is seeking to recover for a separate claim for damage to the Debtor corporations that resulted from the misconduct of the Defendants.  It is foreseeable that the corporations would suffer serious repercussions as a result of the Defendants decisions to defraud consumers.  Indeed those repercussions came to pass in the form of extraordinary increased costs and damages suffered by the corporations themselves.  These damages are clearly alleged in the Amended Complaint.

Second, the Bankruptcy Court dismissed Counts XI and XII on the grounds of the *in pari delicto* defense.  The Bankruptcy Court reasoned that despite a split of authority as to whether the *in pari delicto* defense can be asserted against a trustee, the Fourth Circuit would have applied the defense to bar the Plan Administrator's claims.  However, even if the *in pari delicto* defense generally is recognized within the Fourth Circuit, the law across the nation is virtually uniform that *in pari delicto* does not apply when a trustee is standing in the shoes of a corporation and sues the corporation's officers, directors or other insiders for damages such

---

[3] The Amended Complaint also includes counts against Defendant Douglas Gomes for fraudulent or preferential transfer (Count II); Defendant Dean Nelson for fraudulent or preferential transfer (Count III); and Defendant Carole Nelson for fraudulent transfer (Count X).  These additional counts were not subject to the Motion to Dismiss and remain part of the Amended Complaint.

defendants caused to the corporation.  If the law were otherwise, insiders of a corporation would be immunized for damages asserted against them by the corporation itself.

The Defendants were officers, directors or insiders of the Debtors and were sued as such. The Defendants were sued because they pursued a campaign to collect consumer deposits (that they knew or should have known could not have been honored) for the purpose of lining their own pockets.  The Bankruptcy Court utterly ignored the unbroken line of cases that establishes a clear exception to the *in pari delicto* defense in this circumstance.

It is important that the Court grant the Plan Administrator leave to appeal the Order because recoveries in this adversary proceeding are needed to fund payments to creditors. Creditors include trade creditors who supplied goods and services to the Debtors.  Creditors also include consumers who enjoy priority claim status under the Bankruptcy Code for the deposits that they placed with the Debtors.

If leave to appeal the Order is not granted distributions to creditors would be delayed, and expenses increased, thus diminishing recovery by creditors.  Although the Bankruptcy Court dismissed Counts XI and XII, the Defendants are still in the adversary proceeding.  Discovery and trial will proceed.  If this appeal is not resolved before trial, trial would take place in piecemeal fashion and overlapping evidence would be presented.  This would result in a waste of judicial resources and increased expense to the parties.

If review of the Order is delayed the Debtors and creditors will suffer.  Every extra dollar spent by the Plan Administrator is a dollar out of a creditor's pocket.  Moving forward with the appeal of the Order now would save money and time and accelerate and increase distribution to creditors.

## STATEMENT OF FACTS

### A.    Background Of The Bankruptcy Case

1.    On May 15, 2006 (the "Petition Date"), Mastercraft Interiors, Ltd. and Kimels of Rockville, Inc. (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Maryland (the "Court").

2.    By order entered April 3, 2007, the Court confirmed the Amended Joint Plan of Liquidation filed by the Debtors and the Official Committee of Unsecured Creditors (the "Plan").

3.    The Plan appointed a Plan Administrator who is authorized, among other things, to prosecute "Causes of Action[4] and all other causes of action, except as set forth hereinafter … ." Plan, Art. IV(2)(A)(e).  Plaintiff is the Plan Administrator.

### B.    Background Facts

4.    Debtor Mastercraft Interiors, Ltd. ("Mastercraft") operated as a successful furniture retailer in the Washington, DC metropolitan area for approximately 30 years prior to filing its Chapter 11 petition.   In October of 1988, Mastercraft acquired Debtor Kimels of Rockville, Inc. ("Kimels" and together with Mastercraft, the "Debtors").  Amended Complaint (defined below) at ¶ 16.

5.    During the twelve to fourteen months prior to the Petition Date, the Debtors suffered serious losses of sales and a consequent loss of revenues.  Amended Complaint at ¶ 17.

---

[4] The Plan defines Causes of Action as: "…without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission other event occurring prior to the Petition Date or during the course of the Chapter 11 cases." Plan, Art. II(B)(10). *Clerk of the Bankruptcy Court's Docket, Case Number06-12769,  paper number 449.*

6.     During this period, the Debtors were unable to obtain sufficient bank financing to maintain operations and to pay vendors in the ordinary course of business.  Amended Complaint at ¶ 18.

7.     At all times during the year prior to the Petition Date, the Debtors were insolvent. Amended Complaint at ¶ 19.

8.     To finance their operations during the year prior to the Petition Date, the Debtors – under the control of the Defendants  – commenced a campaign to generate revenue from customer deposits.  In this regard, as of the end of 2004, the amount of customer deposits were approximately $810,000.  By the time the Debtors filed their Chapter 11 petitions, the amount of customer deposit liability had ballooned to approximately $5,500,000.  Numerous individual consumers made such deposits for the purchase of merchandise intended for the consumer's personal, family and household use. Amended Complaint at ¶ 20.

9.     The Debtors did not use the consumer deposits solely to pay for the goods that were the subject of such deposits.  Rather, the Debtors used such funds to pay operating expenses, debt service, previously accrued indebtedness to trade vendors, and salaries and benefits of the Defendants and other insiders.  Amended Complaint at ¶ 21.

10.     Throughout the year prior to the Petition Date, various vendors either terminated or suspended shipments of goods to the Debtors on account of the Debtors' failure to pay amounts owed to such vendors.  These terminations and suspensions of deliveries precluded the Debtors from filling customers' orders.  Defendants knew of the suspensions and terminations of vendor shipments.  Amended Complaint at ¶ 22.

11.     Despite the suspensions and terminations of vendor shipments, the Debtors actively continued to seek and accept orders from customers, and required deposits of 50% of the

retail purchase price for consumer goods ordered by customers.  In certain cases, the Debtors required a 100% deposit from their customers.  Amended Complaint at ¶ 23.

12.     Defendants knew of the Debtors' failing financial condition and knew that the Debtors could not fill the orders that it continued to seek and accept from its customers. Amended Complaint at ¶ 24.

13.     Despite their knowledge of the Debtors' condition, and of the Debtors' inability to fulfill their obligations to customers, Defendants affirmatively directed, encouraged and facilitated the acceptance of deposits from customers.  Amended Complaint at ¶ 25.

14.     Defendants received substantial personal benefit from and on account of the deposits taken from customers.  They and their family members received substantial salaries and benefits as a result of the Debtors' continued operations.  Amended Complaint at ¶ 26.

15.     More importantly, the Defendants' decisions and actions harmed the corporations. Defendants' campaign to collect consumer deposits harmed the Debtors in a number of ways, including causing them to incur substantial staff salaries for additional employees, additional administrative costs, associated legal expenses, and rent for storage facilities in order to address thousands of consumer claims and the legal issues arising on account of the existence of such claims.  But for Defendants' decision to finance operations through the massive and illicit intake of consumer deposits, neither the Debtors nor their estates would have incurred these expenses. Amended Complaint at ¶¶ 114-15.

**C.**     **Background Of Adversary Proceeding**

16.     On or about May 14, 2008, Plaintiff filed a complaint (the "Complaint") that commenced this adversary proceeding (the "Litigation") against, among others (including the

Nelsons), Defendants alleging, in Count I of the Complaint, gross negligence/breach of fiduciary duty.

17.     On June 30, 2008, Defendants filed a Motion to Dismiss Count I of the Complaint, arguing that (a) breach of fiduciary duty was not an independent tort under Maryland law, and (b) the Plaintiff failed to plead the elements of gross negligence.  (The Nelsons filed an essentially identical motion.)

18.     At the hearing on their Motion to Dismiss Count I, Defendants did not argue the points raised in their motion, and instead surprised Plaintiff by questioning, for the first time, whether he had standing to prosecute Count I against the Defendants.

19.     By Order dated August 22, 2008, the Court dismissed Count I of the Complaint and granted Plaintiff leave to amend same.

20.     On September 22, 2008, Plaintiff filed an Amended Complaint (the "Amended Complaint") renumbering Count I as Counts XI and XII, and alleging in Counts XI and XII that Defendants committed negligence and gross negligence thereby damaging Debtors.  A copy of the Amended Complaint is attached as Exhibit B.

21.     On October 21, 2008, Defendants filed a Motion to Dismiss Counts XI and XII of Amended Complaint (the "Motion to Dismiss").  In this Motion to Dismiss, Douglas Gomez and Carolyn Gomez make two arguments: (a) that Counts XI and XII must be brought derivatively by a shareholder of the Debtors, Plaintiff is not a shareholder, and therefore has no standing; and (b) if Plaintiff does have standing, then the doctrine of *in pari delicto* bars Plaintiff's claims. Both positions are patently wrong.

22.     On November 14, 2008, the Plaintiff filed an Opposition to the Motion to Dismiss.

23.     On December 3, 2008, the Bankruptcy Court held a hearing on the Motion to Dismiss and Opposition.

24.     On December 16, 2008, the Bankruptcy Court entered its Order (Paper Number 51) and Memorandum Opinion (Paper Number 52) granting the Motion to Dismiss.  A copy of the Order and Memorandum Opinion is attached hereto as <u>Exhibit A</u>.

## STATEMENT OF QUESTIONS PRESENTED BY THE APPEAL

Did the Bankruptcy Court err when it concluded that Plaintiff lacks standing to prosecute the claims for negligence (Count XI) and gross negligence (Count XII) against the Defendants?

Did the Bankruptcy Court err when it concluded that Count XI (negligence) and Count XII (gross negligence) were barred by the doctrine of *in pari delicto*?

## STANDARD GOVERNING THE DECISION
## WHETHER TO GRANT LEAVE TO APPEAL

Section 158(a) of Title 28 of the United States Code states:

> The district courts of the United States shall have jurisdiction to hear appeals
>
> (1) from final judgments, orders, and decrees;
> (2) from interlocutory orders and decrees issued under section 121(d) of Title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
> (3) with leave of the court, from other interlocutory orders and decrees; of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title . . .

28 U.S.C. 158(a).

No standards are contained in the statute or the Bankruptcy Rule that govern whether leave is to be granted.   Courts have generally adopted the standard set forth under section 1292(b) of Title 28 of the United States Code in considering whether to grant leave to appeal

from an interlocutory order of the bankruptcy court.  *Law Debenture Trust v. Calpine Corp. (In re Calpine Corp.),* 2007 U.S. Dist. LEXIS 1324, at * 19 (S.D.N.Y. 2007); *GE Capital Corp. v. Mach., Inc. (In re Mach., Inc.),* 275 B.R. 303 (B.A.P. 8th Cir. 2002); *Big Rivers Elec. Corp. v. Schilling (In re Big Rivers Elec. Corp.),* 252 B.R. 670 (W.D. KY. 2000); *In re Dino's, Inc.,* 183 B.R. 779 (S.D. Ohio 1995); *In re Neshaminy Office Bldg. Associates,* 81 B.R. 301 (E.D. Pa. 1987).  Section 1292(b) provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.  The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order:  *Provided, however,* that application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b).

"Courts have tended to make the 'controlling question' requirement the same as the requirement that its determination 'may materially advance the ultimate termination of the litigation.'" *See Collier's on Bankruptcy*, ¶ 8003.03 *citing Itel Corp. v. M/S Victoria,* 710 F.2d 199 (5th Cir. 1983); *Bank of New England Corp.*, 218 B.R. 643 (B.A.P. 1st Cir. 1998); *E.F. Hutton & Co. v. Brown*, 305 F. Supp. 371 (S.D. Texas 1969).  Thus, the importance of the matter to the ultimate disposition of the case is the key to the decision on whether to grant leave to appeal.  *Hadar Leasing Int'l, Inc. v. D.H. Overmyer Telecasting Co. (In re Hadar Leasing Int'l, Inc.),* 14 B.R. 819 (S.D. N.Y. 1980).

### STATEMENT OF THE REASONS WHY AN APPEAL SHOULD BE GRANTED

**A.  The District Court should immediately review and reverse the Bankruptcy Court's decision that the Plan Administrator lacks standing**

The question of whether the Plan Administrator has standing to prosecute Counts XI and XII of the Amended Complaint is key to the ultimate disposition of the claims and meets the "controlling question" standard.  Indeed, the Plan Administrator cannot pursue his claims if he does not have standing.  Thus, the Order terminates the Plan Administrator's claims for negligence and gross negligence against the Defendants.

There is also a substantial ground for difference of opinion concerning whether or not standing exists.  In the Opinion, the Bankruptcy Court stated that the Plan Administrator lacked standing because "such causes of action belong to the injured creditors and not the debtor corporation and thus [sic] not subject to enforcement by the Plan Administrator under § 1123(b)(3) of the Bankruptcy Code." *Opinion* at 2.  The Bankruptcy Court further stated "what the court has before it is a derivative form of action."  *See id.*  And, "the court is hard pressed to this day to understand how the collection of funds by the Debtors during the incumbency of the Defendants resulted in damaged to the Debtors."  *See id.*

The Bankruptcy Court erred.  The Plan Administrator did not file a derivative action against the Defendants.  The Plan Administrator met the three elements for standing under section 1123(b)(3) of the Bankruptcy Code, and Maryland case law and statutory law create direct claims owned by the Debtors against the Defendants.

First, the plan must retain the claims to be asserted post-confirmation.  *In re Railworks Corp.,* 325 B.R. 709, 715 (Bankr. D. Md. 2005) *citing In re Mako*, 985 F.2d 1052, 1056 (10th

Cir.1993), *accord Temex Energy, Inc. v. Kirschner (In re Amarex)*, 96 B.R. 330 (W.D. Okla.

1989).[5]

    The second requirement is that if the person seeking to enforce the claim is a stranger to

the estate, the person must be appointed and be a representative of the estate.  *Railworks Corp.,*

325 B.R. at 715, *citing Mako*, 985 F.2d at 1056; *McFarland v. Leyh (In re Texas General*

*Petroleum Corp.),* 52 F.3d 1330, 1334-35 (5th Cir. 1995).

    The first two elements of standing are met.  First, the Plan preserved the Debtors' claims

against the Defendants as now articulated in Counts XI and XII, and second, the Plan appointed

the Plaintiff as representative of the Debtors estates.[6]

---

[5] A chapter 11 plan does not need to specify each individual claim and each specific defendant to reserve claims for assertion by an estate representative after a plan has been confirmed.  A reservation is sufficient if it reserves a category or type of claim.  11 U.S.C. § 1123(b)(3); *Railworks Corp.,* 325 B.R. at 717; *Fleet Nat'l Bank v. Gray (In re Bankvest)*, 375 F.3d 51, 59 (1st Cir. 2004); *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.),* 140 F.3d 1111, 1117 (7th Cir. 1998); *Teligent, Inc. v. BLR Services SAS (In re Teligent, Inc.)*, 307 B.R. 744, 747-48 (Bankr. S.D.N.Y. 2004).  A general reservation of right to pursue claims after a chapter 11 plan has been confirmed will suffice if a plan is specific enough to give adequate notice to creditors of the reservation.  11 U.S.C. § 1123(b)(3); *Railworks Corp.,* 325 B.R. at 717.

[6] To the extent Defendants have indirectly raised an issue regarding these first two elements, Plaintiff submits that they have been easily met.  The terms of the Plan establish that it retained all claims the Debtors had against the Debtors' insiders.  Under Article "IV.  Means of Effectuating the Plan," section "3.  Vesting of Property and Other Rights" provides that:

    On the Effective Date, all property of the Debtors' estates, as defined in Section 541 of the [Bankruptcy] Code, wherever situated, shall vest and continue to vest in the Debtors but in the custody, control and possession of the Plan Administrator for the purpose of fully administering the Plan….  The Plan Administrator is authorized to…commence and prosecute any…Causes of Action, and may assert any defenses that may otherwise have been asserted by the Debtors or a "trustee" under the Code….  Except as provided herein, or as provided in a prior or future order of the Court, no property of the Debtors' estates shall be deemed abandoned and no Avoidance Action or Causes of Action…[shall] be deemed waived, released or compromised by or as a result of this Plan, its confirmation, its consummation or its treatment of any Claim or Interest.

Article IV(2) of the Plan establishes the Plan Administrator as the representative of the Debtors' estate.  Article II(B)(41) defines Plan Administrator to be Brad Englander, Esq.  The Plan also provides creditors with notice of the Plan Administrator's powers.  In this regard, Article 2(A) sets forth the responsibilities and scope of authority of the Plan Administrator which includes, among other things, the right to … "(e) prosecute "Causes of Action and all other causes of action, except as set forth hereinafter …" and the right to… "(h) "Commenc[e] Causes of Action…."  Article IV(2)(B) provides that the Plan Administrator is to make distributions "based upon additional funds obtained through the prosecution of litigation including but not limited to…avoidance actions…as well as other actions that may exist, including but not limited to actions against the Debtor's Insiders ("Litigation Assets")".  Article IV(2)(C) provides for the Plan Administrator's powers to include, "(iii) the power to commence, compromise and settle claims, Causes of Action and causes of action on behalf of or against the post confirmation estate…."  Article IV(2)(F) provides that the Plan Administrator shall reserve a certain sum "to fund the prosecution of

The third requirement is that the claims that are being reserved by the plan for later enforcement and adjudication must belong to the estate or to the debtor.  The plan may only preserve those claims that a trustee in bankruptcy, or a debtor in possession, could have asserted prior to confirmation. *Railworks Corp.,* 325 B.R. at 715; *Pereira v. Farace*, 413 F.3d 330, 342 (2d Cir. 2005); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).

The third element of standing is fulfilled because the claims reserved by the Plan and asserted by the Plaintiff belong to the Debtors.  Under Maryland law, a corporation may sue its insiders for damages that result from injuries caused by insiders.

State law determines which claims belong to the estate, and hence, can be asserted by the trustee.[7]  *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1093 (2d Cir.1995); *Sobchack v. American Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.),* 17 F.3d 600, 607 (2d Cir. 1994) ("Bankruptcy courts have long been charged with ascertaining, under state law, whether claims belong to the bankruptcy estate or to other claimants"); *Brandt v. Bassett (In re Southeast Banking Corp.),* 827 F. Supp. 742, 745 (S.D. Fla. 1993), *rev'd in part on other grounds*, 69 F.3d 1539 (11th Cir. 1995) ("Whether a claim is direct or derivative is a matter of state law").  If the cause of action belongs to the estate, the trustee has exclusive standing to assert it; conversely, if the cause of action belongs solely to the shareholders or creditors, the trustee has no standing to assert it.  *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust),* 25 F.3d 1281, 1284 (5th Cir. 1994).

Maryland law establishes that corporations have the right to sue their own officers, directors, and employees to recover damages for injuries caused by them.  *See Waller v. Waller*,

---

litigation…including but not limited to actions against the Debtors' Insiders, which may be commenced by the Plan Administrator….  Finally, under Article X(9)(1)(v) of the Plan, the court retained jurisdiction to hear and determine all Causes of Action.

[7] Maryland law applies because the Debtors are organized under Maryland law and operated in Maryland.

13

187 Md. 185, 49 A.2d 449 (1946); *Indurated Concrete Corp. v. Abbott*, 195 Md. 496, 508, 74 A.2d 7, 22 (1950); *Danielewicz v. Arnold*, 137 Md.App. 601, 616-18, 769 A.2d 274, 282-84 (2001).  *See also Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002) (analyzing the state of Maryland law regarding duties owed by corporate officers and directors to the corporation and its shareholders in the context of shareholder suits, derivative or direct, against corporate officers, directors and shareholders).

　　*Waller v. Waller* is the leading Maryland case on corporate and shareholder standing.  In confirming a corporation's standing to sue, the Maryland Court of Appeals stated:

> Where directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders, and any damages recovered are assets of the corporation, and the equities of the creditors and stockholders are sought and obtained through the medium of the corporate entity. (citations omitted)  It is universally accepted that officers and directors of a corporation are not allowed to derive from their position any profit or advantage in conflict with the proper of their duty.  If it appears that any corporate official subordinated the interests of the corporation to his own interests, he may become liable to it for any loss he occasioned. (citations omitted).

*Waller*, 187 Md. at 190, 49 A.2d at 452.

　　In *Waller*, a shareholder asserted a claim for damages and sued several parties, alleging that they had conspired to ruin the shareholder and the corporation, and that the object of the conspiracy was primarily to harm the shareholder plaintiff.  The Maryland Court of Appeals disagreed that the shareholder was entitled to damages and stated, "[I]t is the general rule that an action at law to recover damages for an injury to the corporation can be brought only in the name of the corporation itself…"  *See id*.  The *Waller* court further explained: "The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the

value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation." *See id.*

The Maryland Court of Appeals has also held that injury to a corporation's business or property occurs, and is actionable (directly by or on behalf of the corporation), when officers and directors waste funds on perquisites, salaries, and bonuses, or make imprudent investments, *see O'Donnell v. Sardegna*, 336 Md. 18, 24-28, 646 A.2d 398, 401-03 (1994), and the Maryland Court of Special Appeals has further ruled that corporate business or property injury occurs, and is actionable, if officers and directors mismanage or misappropriate funds. *Tafflin v. Levitt*, 92 Md. App. 375, 381, 608 A.2d 817, 820 (1992).

It is clear that a Maryland corporation owns claims for breach of duties against its officers, directors and employees, directly and has the right to seek redress from them. *Accord Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002); *Pritchard v. Myers*, 174 Md. 66, 197 A. 620 (1938) (Maryland Court of Appeals held that a claim by depositors of an insolvent bank for "damages" caused by mismanagement of the bank's assets belonged to the bank itself, rather than to the individual depositors, and could only be brought by the bank's receiver. "The equities of the corporate creditors (depositors) are to be sought and obtained through the medium of the corporate entity." *See id.* at 77, 197 A. 620 (citations omitted)).

This principle is reiterated in relevant Maryland statutory law.  The fiduciary duties a director owes to a corporation under MD. CODE ANN., Corps. & Assn's § 2-405.1(a) are duties of good faith, care, and loyalty.  Those duties run to the corporation. MD. CODE ANN., Corps. & Assn's § 2-405.1(g).  It is the corporation itself (or a shareholder derivatively on behalf of a corporation) that can sue for breach thereof. *Werbowsky v. Collomb*, 362 Md. 581, 599, 766 A.2d 123, 133 (2001) (Notwithstanding that directors' duties may run simultaneously to a

corporation and its shareholders, under Maryland law, such duties are enforceable only by, or on behalf of, the corporation); *see also Stender v. Girardi*, 2008 WL 4452117, *15 (D. Colo. Sept. 30, 2008) (same, and finding at least three Maryland trial courts that also found same thereby confirming that the asserted claims belong to the corporation).

The Bankruptcy Court ignored Maryland case law and statutory law. By doing so the Bankruptcy Court ignored substantial controlling authority and committed a clear error. This error cut off the Plan Administrator's ability to pursue the estates' claims against the Defendants. The loss of these claims causes irreparable damage to the Debtors estates. An immediate appeal from the Order would materially advance the ultimate outcome of the litigation.

### B. **The District Court should immediately review and reverse the Bankruptcy Court's decision that the *in pari delicto* defense bars the Plan Administrator's claims**

The questions of whether the Defendants may assert the defense of *in pari delicto* to Counts XI (negligence) and XII (gross negligence) are key to the outcome of litigation.

There is substantial ground for difference of opinion on the Bankruptcy Court's ruling. In the Opinion, the Bankruptcy Court stated, "[w]hile some authors urge that it is inappropriate to apply this [*in pari delicto*] doctrine to hamstring a bankruptcy trustee who had no connection with the original misconduct, the principle remains generally accepted." *See Opinion* at 3. "It has been consistently applied in bankruptcy cases to bar bankruptcy trustee [sic] from suing insiders and professionals, who, prior to the filing of the petition, caused damage to the debtor." *See id.* In support of this statement the Bankruptcy Court cited three cases and stated "the court believes that the three cases cited state the applicable law, and that the Fourth Circuit would so hold until it adopts the position that the trustee is not subject to the defense of *in pari delicto* as urged by Judge King in his dissent in *Bogdan, supra* at 515." *See Opinion* at 3 citing *Official Comm. of Unsecured Creditors v. R.E. Lafferty & Co., Inc.,* 267 F.3d 340, 355-360 (3d Cir.

2001); *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (11th Cir. 2006); *Grassmueck v. American Shorthorn Ass'n*, 402 F.3d 833, 836 (8th Cir. 2005).[8]

The Bankruptcy Court is mistaken, although the Fourth Circuit has not spoken directly on the issue, bankruptcy courts have consistently held that the *in pari delicto* doctrine is not available for defendants to avoid liability for damages that they caused to their former corporate employers.   Abundant case law stands for the proposition that corporate insiders cannot utilize the defense of *in pari delicto* to shield themselves from liability for their own wrongdoing:

> *Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991) ("A claim *against a third party* for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." (emphasis added));
>
> *In re Amcast Industrial Corp.*, 365 B.R. 91, 123-24 (Bankr. S.D.Ohio 2007) ("While *in pari delicto* may be used as a defense to bar claims against third parties, it does not apply to bar claims against officers and directors, who are corporate insiders.")
>
> *In re Oakwood Homes Corp.*, 340 B.R. 510, 536 (Bankr. D.Del. 2006) (*In pari delicto* does not provide a defense for insiders in case with complaint that clearly states defendants became insiders, fiduciaries, and de facto controllers of the debtor.)

---

[8] The Bankruptcy Court's reference to *Bogdan* is a reference to *Logan v. JKV Real Estate Services (In re Bogdan),* 414 F.3d 507 (4th Cir. 2005). In *Bogdan*, the Fourth Circuit held that the *in pari delicto* doctrine did not bar recovery. *Bogdan* is irrelevant to this adversary proceeding because of the unique facts and circumstances of that case. In *Bogdan*, the plaintiff-chapter 7 trustee was the assignee of certain litigation claims from mortgage lenders who were allegedly defrauded into making undercollateralized loans to the debtor. In exchange for the assignment, the mortgage lenders agreed to share any proceeds of the litigation claims with the entire bankruptcy estate on a *pro rata* basis. The chapter 7 trustee commenced suit asserting the assigned claims against third party mortgage lenders alleged to be co-conspirators of the debtor. In reversing the ruling of the bankruptcy court as affirmed by the district court, the Fourth Circuit determined that *in pari delicto* did not prevent the chapter 7 trustee from bringing the assigned claims against the third party mortgage lenders because as assignee, the trustee stood in the shoes of the lenders which committed no wrongdoing.

The fundamental difference between this case and *Bogden,* and the reason why *Bogden* is a red herring, is in the *Bogden* case "nearly fifty other persons and entities – real estate appraisers, settlement agents, mortgage brokers, and title insurance companies – participated with [Michael] Bogden in the real estate "flipping scheme" that defrauded numerous mortgage lenders." *See Bogden*, 414 F.3d at 509. The plaintiff in the *Bogden* case brought suit in the name of mortgage lenders who were harmed by the debtor (Michael Bogden) who acted in concert with nearly fifty other people who were not insiders of the debtor.

This case is much different than *Bogden*, and arguably involving much simpler facts than the *Bogden* case. The damage suffered in this case is to the Debtors. The persons who caused the damage are the Debtors former insiders (the Defendants) who acted on their own – not in concert with others.

*In re Verestar, Inc.*, 343 B.R. 444, 479 (Bankr. S.D.N.Y. 2006) (relying on *Wagoner* for the proposition that "a plaintiff acting on behalf of a debtor cannot sue an *outside professional or other third party* for damages for which the corporation itself can be held responsible" (emphasis added));

*Global Crossing Estate Representative v. Winnick*, 2006 WL 2212776, *15-16 (S.D.N.Y. August 3, 2006) (*Wagoner* and *in pari delicto* rules do not apply to estate representative's claims against insiders);

*In re IDI Constr. Co.*, 345 B.R. 60, 67 (Bankr. S.D.N.Y. 2006) (holding that a debtor could sue its principals "to recover the unpaid loans or to recover damages under any other theory," and noting that "[t]he *Wagoner* Rule does not bar claims by a corporation against its own fiduciaries") (emphasis added);

*In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 23 (Bankr. E.D.N.Y. 2006) ("Here, the trustee has standing to bring this action on behalf of the debtor.  The present allegations set forth a situation that is different than the fact pattern in which *Wagoner* is generally invoked, where an outsider, such as an accounting or law firm, is alleged to have assisted management in defrauding the corporation.");

*In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 425 (Bankr. S.D.N.Y. 2005) (acknowledging that *Wagoner* "does not bar claims against corporate fiduciaries");

*In re Hampton Hotel Investors, L.P.*, 289 B.R. 563, 577 n. 23 (Bankr. S.D.N.Y. 2003) ("The *Wagoner* Rule only deals with claims against third parties.  It does not proscribe actions against insiders for breach of fiduciary duty, which are properly claims of the trustee.");

*Official Committee of Unsecured Creditors v. Shapiro*, 2001 WL 1468250 (E.D.Pa. Nov. 16, 2001) (*In pari delicto* bars claims against third parties, but does not apply to corporate insiders or partners." (*citing Granite Partners*) and "Unlike outside consultants and advisors, insiders exercise control over a corporation and should not benefit from *in pari delicto*, which is an equitable defense.")

*In re Walnut Leasing Co.*, No. 99-526, 1999 WL 729267, at *5 & n. 12 (E.D.Pa.1999) (noting that "*in pari delicto* will not preclude the claims against corporate insiders," that "[v]is-a-vis their corporations, insiders cannot avoid the consequences of their own handiwork" and that "[n]o reported authority suggests that an officer or director can assert the defense of *in pari delicto* as defenses to the claim brought here on behalf of the debtor corporations");

*In re KDI Holdings, Inc.*, 277 B.R. 493, 518 (Bankr.S.D.N.Y. 1999) (holding defense inapplicable to claims against alleged dominating and

controlling outside entities); *Id.* ("[T]he *in pari delicto* doctrine is inapplicable where a cause of action is brought against an insider.");

*Kalb, Voorhis & Co. v. Am. Fin. Corp.,* 8 F.3d 130, 133 (2d Cir. 1993) (holding "*in pari delicto*" defense inapplicable to claim against corporation's controlling shareholder under Texas law).

WHEREFORE, the Court should grant the Motion for leave to file an appeal of the Order, and grant such other relief as the Court deems just and proper.

Dated: December 26, 2008                PLATZER, SWERGOLD, KARLIN, LEVINE,
                                        GOLDBERG & JASLOW, LLP

                                        */s/ Andrew S. Muller*
                                        Sydney G. Platzer, Esq.
                                        Andrew S. Muller, Esq.
                                        1065 Avenue of The Americas, 18th Fl.
                                        New York, New York 10018
                                        Telephone: (212) 593-3000
                                        Facsimile: (212) 593-0353

                                        *Co-counsel for the Plan Administrator*


                                        LINOWES AND BLOCHER LLP

                                        */s/ Jennifer Larkin Kneeland*
                                        Bradford F. Englander, Federal Bar No. 11951
                                        Jennifer Larkin Kneeland, Federal Bar No. 14916
                                        7200 Wisconsin Avenue, Suite 800
                                        Bethesda, Maryland 20814
                                        Telephone: (301) 961-5125
                                        Facsimile: (301) 654-2801
                                        Benglander@linowes-law.com

                                        *Co-counsel for the Plan Administrator*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of December, 2008 a copy of the foregoing Motion For Leave To File Appeal was sent via this court's ECF system on the following parties:

Lawrence P. Block
Janet M. Nesse
Katherine Sutcliffe Becker
Stinson, Morrison, Hecker LLP
1150 18th St. NW, Ste. 800
Washington, DC 20036

Alan D. Eisler
Stark, Meyers, Eisler, Leatham LLC
11140 Rockville Pike, Ste. 570
Rockville, MD 20852

Richard H. Gins
The Law Office of Richard H. Gins, LLC
3 Bethesda Metro Center
Suite 530
Bethesda, MD 20814

*/s/ Jennifer Larkin Kneeland*
Jennifer Larkin Kneeland

L&B 1103557v2/10745.0001

20

# EXHIBIT A

**SO ORDERED**



_____
PAUL MANNES
U. S. BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at Greenbelt**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| MASTERCRAFT INTERIORS, LTD. | : | Case No. 06-12769PM |
| KIMELS OF ROCKVILLE, INC. | : | Case No. 06-12770PM |
| | : | Chapter 11 |
| Debtors | : | (Jointly Administered) |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - : | | |
| BRADFORD F. ENGLANDER | : | |
| In his capacity as Plan Administrator for | : | |
| Mastercraft Interiors, Ltd., and | : | |
| Kimels of Rockville, Inc. | : | |
| Plaintiff | : | |
| vs. | : | Adversary No. 08-0424PM |
| | : | |
| DOUGLAS GOMEZ, et al. | : | |
| Defendants | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - : | | |

**ORDER GRANTING MOTION TO DISMISS
COUNTS XI AND XII OF THE FIRST AMENDED COMPLAINT**

Upon consideration of the Motion to Dismiss Counts XI and XII of the First Amended
Complaint filed by Defendants Douglas Gomez and Carolyn Gomez that was joined in by the
Defendants Dean Nelson and Carole Nelson, and the opposition thereto, and for the reasons
stated in the Memorandum of Decision filed this day, it is, by the United States Bankruptcy
Court for the District of Maryland,

ORDERED That the Motion is GRANTED; and it is further

ORDERED That Counts XI and XII of the First Amended Complaint are DISMISSED.

cc:
Alan D. Eisler, Esq., 11140 Rockville Pike, Suite 570, Rockville, MD 20852
Sydney Platzer/Andrew Muller, Esq., 1065 Avenue of the Americas, New York NY 10018
Bradford F. Englander, Esq., 7200 Wisconsin Avenue, Suite 800, Bethesda, MD 20814
United States Trustee, 6305 Ivy Lane, #600, Greenbelt  MD  20770

**End of Order**

Date signed December 15, 2008



_____
PAUL MANNES
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | : | |
| MASTERCRAFT INTERIORS, LTD. | : | Case No. 06-12769PM |
| KIMELS OF ROCKVILLE, INC. | : | Case No. 06-12770PM |
| | : | Chapter 11 |
| Debtors | : | (Jointly Administered) |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - : | | |
| BRADFORD F. ENGLANDER | : | |
| In his capacity as Plan Administrator for | : | |
| Mastercraft Interiors, Ltd., and | : | |
| Kimels of Rockville, Inc. | : | |
| Plaintiff | : | |
| vs. | : | Adversary No. 08-0424PM |
| | : | |
| DOUGLAS GOMEZ, et al. | : | |
| Defendants | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - : | | |

### MEMORANDUM OF DECISION

On December 3, 2008, the court conducted a hearing on the Motion filed by Defendants Douglas Gomez and Carolyn Gomez to dismiss Counts XI and XII of the Amended Complaint. In the course of the hearing, the court granted the oral motion of the Defendants Dean Nelson and Carole Nelson to join in the Motion to Dismiss. For the reasons stated hereafter, the court will grant the Motion to Dismiss.

Count XI of the Amended Complaint charges the Defendants with negligence in the discharge of their duties as employees, officers, directors, and managers of the Debtors. Specifically, the claim is that the Defendants failed to exercise reasonable diligence by accepting

Case 08-00424   Doc 52   Filed 12/16/08   Page 2 of 4

consumer deposits for furniture orders that they knew they were unable to fulfill and by not segregating these deposits. The Amended Complaint pleads that as a result of the Defendants' alleged negligence that the Debtors suffered damages in excess of $5.5 million. The Amended Complaint states that unnecessary liabilities for the Debtors were created. Count XII charges the Defendants with gross negligence and the breach of their fiduciary duties to the Debtors.

The Motion to Dismiss filed by the Gomezes is based upon two grounds – first, that the Plan Administrator lacks standing to prosecute these claims and, next, that the claims are barred by the equitable doctrine of *in pari delicto*. The court will grant the Motion to Dismiss. Either ground suffices to support the ruling.

The Plan Administrator is an entity created by the Chapter 11 plan to prosecute causes of action of the estates. This entity is akin to a bankruptcy trustee. As noted by Judge Schneider in the case of *In re Transcolor Corp.*, 296 B.R. 343, 367 (BC Md. 2003), a bankruptcy trustee does not have standing to sue third parties such as corporate affiliates or directors. This is because such causes of action belong to the injured creditors and not the debtor corporation and thus not subject to enforcement by the Plan Administrator under § 1123(b)(3) of the Bankruptcy Code.

Presumably, the Plan Administrator is relying upon Section IV(2)(A) of the Amended Joint Plan of Liquidation for his authority for prosecution of causes of action. "Causes of action" is a defined term set out in Section II (B)(10) of the Amended Joint Plan. But what the court has before it is a derivative form of action. *See, Mona v. Mona Electric Group, Inc.*, 934 A.2d 450, 464-65 (Md. App. 2007). The whole body of shareholders or equity interest holders was dissolved by Section III(8) of the Amended Joint Plan that effected cancellation of all shares of stock in the company. Finally, the court notes that while both parties find some comfort in the language of the case of *Bogdan v. JKV Real Estate Services*, 414 F.3d 507 (CA4 2005), that case is easily distinguished in that it involved unconditional assignments acquired by the Chapter 7 Trustee of claims held by debtor's creditors. There are no such assignments here. Next, the court is hard pressed to this day to understand how the collection of funds by the Debtors during the incumbency of the Defendants resulted in damage to the Debtors. The damage occurred when the funds were spent.

What the Plan Administrator seeks to do in this case is to turn the undisputed facts on their head in his allegation that the Debtors were harmed by the collection of consumer deposits.

The parties harmed were the parties making the deposits, not the recipient of the payments.  The Plan Administrator holds no *Bogdan*-type assignments from them.

 Similarly, the counts fail because of the doctrine of *in pari delicto*.  While some authors urge that it is inappropriate to apply this doctrine to hamstring a bankruptcy trustee who had no connection with the original misconduct, the principle remains generally accepted.  *See* JEFFREY DAVIS, *Ending the Nonsense: The In Pari Delicto Doctrine Has Nothing to Do With What is § 541 Property of the Bankruptcy Estate*, 21 EMORY BANKR. DEV. J. 519 (2005); RISA LYNN WOLF-SMITH, *Innocent Trustee/Creditors Barred by Debtors' Past Wrongs: It Just Ain't Right,* 26-APR AM. BANKR. INST. J. (Apr. 2007); WILLIAM MCGRANE, *The Erroneous Application of the Defense of In Pari Delicto to Bankruptcy Trustees,* 29 CAL. BANKR. J. 275 (2007).  Were the court writing on a clean slate, it would agree with the opponents; however, the overwhelming authority is to the contrary.  The doctrine is an offshoot of the equitable doctrine that "he who comes into equity must come with clean hands."  It has been consistently applied in bankruptcy cases to bar bankruptcy trustee from suing insiders and professionals, who, prior to the filing of the petition, caused damage to the debtor.  The doctrine has long been a part of Maryland law.  *Gotwalt v. Neal*, 25 Md. 434 (Md. 1866);  *Messick v. Smith*, 69 A.2d 478, 481 (Md. 1949); *Franklin v. Morrison*, 711 A.2d 177, 187 (Md. 1998).  In the bankruptcy context, the case of *Official Comm. of Unsecured Creditors v. R. E. Lafferty & Co., Inc.,* 267 F.3d 340, 355-360 (CA3 2001) is often cited for the proposition that the doctrine bars claims by a bankruptcy trustee standing in the shoes of a debtor despite the trustee's status as an innocent successor.  *See also*, *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (CA11 2006)*; Grassmueck v. American Shorthorn Ass'n*, 402 F.3d 833, 836 (CA8 2005).  The court believes that the three cases cited state the applicable law, and that the Fourth Circuit would so hold until it adopts the position that the trustee is not subject to the defense of *in pari delicto* as urged by Judge King in his dissent in *Bogdan, supra* at 515.

 An appropriate order will be entered.

cc:
Alan D. Eisler, Esq., 11140 Rockville Pike, Suite 570, Rockville, MD 20852
Sydney Platzer/Andrew Muller, Esq., 1065 Avenue of the Americas, New York NY 10018
Bradford F. Englander, Esq., 7200 Wisconsin Avenue, Suite 800, Bethesda, MD 20814
United States Trustee, 6305 Ivy Lane, #600, Greenbelt  MD  20770

**End of Memorandum**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MARYLAND
## (Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | (Chapter 11) |
| | | Case Nos. 06-12769 (PM) and |
| **MASTERCRAFT INTERIORS, LTD.** | * | 06-12770 (PM) |
| **KIMELS OF ROCKVILLE, INC.,** | | |
| | * | |
| Debtors. | | Jointly Administered |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| **BRADFORD F. ENGLANDER,** | * | |
| In his capacity as Plan Administrator for | | |
| Mastercraft Interiors, Ltd., and Kimels of | * | |
| Rockville, Inc., | | |
| | * | |
| Plaintiff, | | |
| | * | |
| v. | | Adv. Proc. No. 08-00424 (PM) |
| | * | |
| **DOUGLAS GOMEZ, CAROLYN** | | |
| **GOMEZ, DEAN NELSON, CAROLE** | * | |
| **NELSON, DANNY L. GOMEZ,** | | |
| **GEORGE GOMEZ, REBECCA** | * | |
| **GOMEZ, ANGELA KING, QUENTON** | | |
| **KING and DONALD BEAUDOIN,** | * | |
| | | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*

## FIRST AMENDED COMPLAINT

Bradford F. Englander, Plan Administrator ("Plan Administrator") for debtors,

Mastercraft Interiors, Ltd. and Kimels of Rockville, Inc. (the "Debtors"), files this first amended

complaint (the "Complaint") for damages and for the avoidance and recovery of transfers

pursuant to chapter 5 of Title 11 of the United States Code (the "Bankruptcy Code") and for the

other and further relief requested herein.  The grounds for this Complaint are as follows:

## JURISDICTION AND VENUE

1.      This court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(A), (B), (F), (H) and (O).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1409(a) and 1409(d).  A substantial portion of the events or omissions giving rise to this Complaint occurred within the District of Maryland.

## PARTIES

3.      The Plaintiff is Bradford F. Englander, Plan Administrator for the Debtors.

4.      The Debtors were sellers of furniture with retail locations in Maryland and Virginia.

5.      Defendant Douglas Gomez is an individual.  At all times relevant to this Complaint, defendant Douglas Gomez was the President, Secretary, Director, and a person in control of the Debtors.  Since February of 2004, defendant Douglas Gomez has been the holder of 90% of the equity interests in the Debtors.  At all times relevant to this Complaint, defendant Douglas Gomez was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

6.      Defendant Carolyn Gomez is an individual.  At all times relevant to this Complaint, defendant Carolyn Gomez was the Vice President, Secretary and Director of the Debtors, and was a person in control of the Debtors.  Defendant Carolyn Gomez was and remains married to defendant Douglas Gomez.  At all times relevant to this Complaint, defendant Carolyn Gomez was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

2

7.    Defendant Dean Nelson is an individual.  At all times relevant to this Complaint, defendant Dean Nelson was the Debtors' Vice President of Finance, Treasurer, Assistant Secretary, Chief Financial Officer, and was a person in control of the Debtors.  At all times relevant to this Complaint, defendant Dean Nelson was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

8.    Defendant Carole Nelson is an individual.  At all times relevant to this Complaint, defendant Carole Nelson held and exercised management authority, and was a person in control of the Debtors.  At all times relevant to this Complaint, Defendant Carole Nelson acted as a de facto officer of the Debtors.  Defendant Carole Nelson was and remains married to defendant Dean Nelson.  At all times relevant to this Complaint, defendant Carole Nelson was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

9.    Defendant Danny L. Gomez is an individual.  Defendant Danny Gomez was a shareholder of the Debtor prior to February of 2004.  Defendant Danny Gomez is the brother of defendant Douglas Gomez.  At all times relevant to this Complaint, defendant Danny Gomez was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

10.    Defendant George Gomez is an individual.  Defendant George Gomez is the father of defendants Douglas Gomez and Danny L. Gomez.  At all times relevant to this Complaint, defendant George Gomez was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

11.    Defendant Rebecca Gomez is an individual.  Defendant Rebecca Gomez is the mother of defendants Douglas Gomez and Danny L. Gomez.  At all times relevant to this Complaint, defendant Rebecca Gomez was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

12.     Defendant Angela King is an individual.  Defendant Angela King is the daughter of Carole Nelson.  At all times relevant to this Complaint, defendant Angela King was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

13.     Defendant Quenton King is an individual.  Defendant Quenton King is the husband of defendant Angela King.  At all times relevant to this Complaint, defendant Quenton King was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

14.     Defendant Donald Beaudoin is an individual.  Defendant Donald Beaudoin is the brother-in-law of defendant Douglas Gomez.  At all times relevant to this Complaint, defendant Donald Beaudoin was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

15.     Defendant Joel Snyder is an individual.  Defendant Joel Snyder is the son-in-law of defendant Douglas Gomez.  At all times relevant to this Complaint, defendant Joel Snyder was an insider, as such term is defined in Section 101(31) of the Bankruptcy Code.

## FACTS COMMON TO ALL COUNTS

16.     Debtor Mastercraft Interiors, Ltd. operated as a successful furniture retailer in the Washington, D.C. metropolitan area for approximately 30 years prior to filing its Chapter 11 petition.  In October of 1988, Mastercraft acquired Debtor Kimels of Rockville, Inc.

17.     During the twelve to fourteen months prior to the Petition Date (as defined below), the Debtors suffered serious loss of sales and a consequent loss of revenues.

18.     During this period, the Debtors were unable to obtain sufficient bank financing to maintain operations and to pay vendors in the ordinary course of business.

19.     At all times during the year prior to the Petition Date, the Debtors were insolvent.

4

20.     To finance their operations during the year prior to the Petition Date, the Debtors – under the control of defendants Douglas Gomez, Carolyn Gomez, Dean Nelson and Carole Nelson – commenced a campaign to generate revenue from customer deposits.  As of the end of 2004, the amount of customer deposits were approximately $810,000.  By the time the Debtors filed their Chapter 11 petitions, the amount of customer deposit liability had ballooned to approximately $5,500,000.  Such deposits were made by numerous individual consumers for the purchase of merchandise intended for their personal, family and household use.

21.     The Debtors did not use the consumer deposits solely to pay for the goods that were the subject of such deposits.  Rather, the Debtors used such funds to pay operating expenses, debt service, previously accrued indebtedness to trade vendors, and salaries and benefits of the Defendants and other insiders.

22.     Throughout the year prior to the Petition Date, various vendors either terminated or suspended shipments of goods to the Debtors on account of the Debtors' failure to pay amounts owed to such vendors.  These terminations and suspensions of deliveries precluded the Debtors from filling customers' orders.  Defendants Douglas Gomez, Carolyn Gomez, Dean Nelson and Carole Nelson knew of the suspensions and terminations of vendor shipments.

23.     Despite the suspensions and terminations of vendor shipments, the Debtors actively continued to seek and accept orders from customers.  The Debtors required deposits of 50% of the retail purchase price for consumer goods ordered by the customers.  In certain cases, the Debtors required a 100% deposit from their customers.

24.     Defendants Douglas Gomez, Carolyn Gomez, Dean Nelson and Carole Nelson each knew of the Debtors' failing financial condition.  Each such defendant knew that the Debtors could not fill the orders that it continued to seek and accept from its customers.

25.     Despite their knowledge of the Debtors' condition, and of the Debtors' inability to fulfill their obligations to customers, defendants Douglas Gomez, Carolyn Gomez, Dean Nelson and Carole Nelson affirmatively directed, encouraged and facilitated the acceptance of deposits from customers.

26.     Defendants Douglas Gomez, Carolyn Gomez, Dean Nelson and Carole Nelson received substantial personal benefit from and on account of the deposits taken from customers. They and their family members received substantial salaries and benefits as a result of the Debtors' continued operations.

27.     On May 15, 2006 (the "Petition Date"), the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

28.     On December 7, 2006, the Debtors and the Official Committee of Unsecured Creditors of Mastercraft Interiors, Ltd., and Kimels of Rockville, Inc. (the "Committee") filed their Joint Plan of Liquidation and Disclosure Statement in Support of the Joint Plan [Clerk's docket nos. 385 and 386 respectively].

29.     On February 6, 2007, the Debtors filed their Amended Disclosure Statement ("Amended Disclosure Statement") [Clerk's docket no. 445].  The Court entered the order approving the Amended Disclosure Statement on February 8, 2007 [Clerk's docket no. 448].

30.     On February 8, 2007, the Debtors and the Committee filed their Amended Joint Plan of Liquidation ("Amended Plan") [Clerk's docket no. 449].  On April 3, 2007, this Court entered an Order confirming the Amended Plan [Clerk's docket no. 504].

## COUNT I

### [AMENDED AND RENUMBERED AS COUNTS XI THROUGH XII]

31.      [Paragraphs 31 through 36 are intentionally omitted]

## COUNT II

### FRAUDULENT OR PREFERENTIAL TRANSFER
### (Defendant Douglas Gomez)

37.     The allegations contained in paragraphs 1 through 36 are incorporated by reference as if fully set forth herein.

38.     On or about February 28, 2000, the Debtors loaned or advanced $100,000 to Defendant Douglas Gomez on an interest-free basis.  Thereafter, defendant Douglas Gomez made various payments, or received credits from the Debtors.

39.     In February of 2004, the Debtors advanced an additional $240,000 to defendant Douglas Gomez on an interest-free basis.  The Plan Administrator is informed and believes that Douglas Gomez drew these funds from the Debtors in order to fund his acquisition of the equity interests in the Debtors then owned by his brother, Danny L. Gomez.

40.     According to the Debtors' books and records, the amounts owed by Douglas Gomez to the Debtors as of December 31, 2004, was $307,538, exclusive of interest.

41.     In November and December of 2005, Defendant Douglas Gomez made two payments to the Debtors, each in the amount of $125,000.  Such payments were made at a time when the Debtors were deeply insolvent and in need of cash.  Although Defendant Douglas Gomez has sought to characterize such payments as partial repayments of his indebtedness to the Debtors, in reality such payments were necessary contributions of capital by the 90% shareholder of the Debtors.  Such payments did not have the effect of reducing the indebtedness of defendant Douglas Gomez to the Debtors.

42.     In April of 2006, less than two months prior to the Petition Date, and in contemplation of the Debtors' upcoming bankruptcy filings, defendant Douglas Gomez caused the Debtors to purportedly write off and cancel the remaining balance of the loan.

43.     The purported cancellation of the loan balance was ineffective or, alternatively, constituted a transfer of an interest of the Debtors in property.

44.     Such transfer, to the extent it occurred, was intended by the Debtors and defendant Douglas Gomez to hinder, delay and defraud creditors of the Debtors.

45.     Such transfer, to the extent it occurred, was made at a time when the Debtors were insolvent, and was not in exchange for reasonably equivalent value.

46.     Alternatively, such transfer was made for or an on account of an antecedent debt owed from the Debtors before such transfer was made; was made at a time when the Debtors were insolvent; was made on or within ninety days before the Petition Date; enabled defendant Douglas Gomez to receive more than he would have received if this case was filed under chapter 7 of the Bankruptcy Code, if such transfer had not been made, and if he had received payment of the antecedent debts to the extent provided by the Bankruptcy Code.

47.     Defendant Douglas Gomez was the initial transferee of such transfer, or was the person for whose benefit such transfer was made.

48.     The transfer is avoidable under Sections 547(b) and/or 548, and is recoverable under Section 550 of the Bankruptcy Code.

WHEREFORE, the Plan Administrator demands judgment against defendant Douglas Gomez in an amount not less than Three Hundred Seven Thousand Five Hundred Thirty Eight Dollars ($307,538), plus interest and costs.

## COUNT III

### FRAUDULENT OR PREFERENTIAL TRANSFER
### (Defendant Dean Nelson)

49.     The allegations contained in paragraphs 1 through 48 are incorporated by reference as if more fully set forth herein.

8

50.     From time to time, the Debtors made loans to defendant Dean Nelson.  As of April, 2006, the balance of such loans owed by defendant Dean Nelson to the Debtors was not less than $20,000.

51.     In April of 2006, less than two months prior to the Petition Date, and in contemplation of the Debtors' upcoming bankruptcy filings, defendant Dean Nelson caused the Debtors to write off and cancel the remaining balance of the loan.

52.     The cancellation of the loan balance constituted a transfer of an interest of the Debtors in property.

53.     Such transfer was intended by the Debtors and defendant Dean Nelson to hinder, delay and defraud creditors of the Debtors.

54.     Such transfer was made at a time when the Debtors were insolvent, and was not in exchange for reasonably equivalent value.

55.     Alternatively, such transfer was made for or an on account of an antecedent debt owed from the Debtors before such transfer was made; was made at a time when the Debtors were insolvent; was made on or within ninety days before the Petition Date; enabled defendant Dean Nelson to receive more than he would have received if this case was filed under chapter 7 of the Bankruptcy Code, if such transfer had not been made, and if he had received payment of the antecedent debts to the extent provided by the Bankruptcy Code.

56.     Defendant Dean Nelson was the initial transferee of such transfer, or was the person for whose benefit such transfer was made.

57.     The transfer is avoidable under Sections 547(b) and/or 548, and is recoverable under Section 550 of the Bankruptcy Code.

WHEREFORE, the Plan Administrator demands judgment against defendant Dean

Nelson in an amount not less than Twenty Thousand Dollars ($20,000), plus interest and costs.

## COUNT IV

### FRAUDULENT TRANSFER/OBJECTION TO CLAIM
### (Defendant Danny L. Gomez)

58.     The allegations contained in paragraphs 1 through 57 are incorporated by

reference as if more fully set forth herein.

59.     In February of 2004, Debtor Mastercraft Interiors, Ltd. entered into an

Employment Termination and Consulting Agreement (the "Consulting Agreement") with

defendant Danny L. Gomez.  A true and correct copy of the Consulting Agreement is attached

hereto as Exhibit A.

60.     The purpose of the Consulting Agreement was to effectuate a buy out of

defendant Danny L. Gomez's equity interest in the Debtors.

61.     The Consulting Agreement required defendant Danny L. Gomez to provide

consulting services, up to 20 hours per week, to the Debtors.  During the two years prior to the

Petition Date, defendant Danny L. Gomez did not provide any consulting services to the Debtors.

62.     The Plan Administrator is informed and believes that during the two years prior to

the Petition Date, the Debtors paid defendant Danny L. Gomez in excess of $306,000 pursuant to

the Consulting Agreement.

63.     Such transfers were intended by the Debtors and defendant Danny L. Gomez to

hinder, delay and defraud creditors of the Debtors.

64.      Such transfers were made at a time when the Debtors were insolvent, and were

not in exchange for reasonably equivalent value.

65.     Such transfers were to of for the benefit of an insider, were made under an employment contract, and were not made in the ordinary course of business.

66.     Defendant Danny L. Gomez was the initial transferee of such transfers, or was the person for whose benefit such transfers were made.

67.      The transfers are avoidable under Sections 548, and are recoverable under Section 550, of the Bankruptcy Code.

68.     Defendant Danny L. Gomez filed a proof of claim (no. 997), in the amount of $1,225,712, against the Debtors. Pursuant to Section 502(d) of the Bankruptcy Code, such claim should be disallowed unless and until defendant Danny L. Gomez has repaid all avoidable transfers.

69.     The claim filed by Danny L. Gomez is for services of an insider, and the amount of such claim exceeds the value of such services. Consequently, such claim should be disallowed pursuant to Section 502(b)(4) of the Bankruptcy Code.

70.     The claim filed by Danny L. Gomez includes a contingent claim for indemnification or contribution in the amount of $1,000,000. Such claim remains contingent and, consequently, should be disallowed pursuant to Section 502(e)(1)(B) of the Bankruptcy Code.

WHEREFORE, the Plan Administrator demands judgment against defendant Danny L. Gomez in an amount not less than Three Hundred Six Thousand Dollars ($306,000), plus interest and costs, and that the claim of Defendant Danny L. Gomez be disallowed.

## COUNT V

## PREFERENTIAL TRANSFER/OBJECTION TO CLAIM
### (Defendant Danny L. Gomez)

71.     The allegations contained in paragraphs 1 through 70 are incorporated by reference as if more fully set forth herein.

72.     During the year prior to the Petition Date, the Debtors paid at least $153,000 to Defendant Danny L. Gomez pursuant to the Consulting Agreement.

73.     Such payments were transfers of the Debtors' property.

74.     Such payments were to or for the benefit of a creditor.

75.     Such payments were made while the Debtors were insolvent.

76.     Such payments were made during the year prior to the Petition Date.

77.     Such payments enabled Defendant Danny L. Gomez to receive more than he would have received if the case were a case under chapter 7 of the Bankruptcy Code, such payments had not been made, and Defendant Danny L. Gomez had received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

78.     The payments totaling in excess of $153,000 to Defendant Danny L. Gomez during the year prior to the Petition Date are avoidable under Section 547(b) of the Bankruptcy Code.

WHEREFORE, the Plan Administrator demands judgment against defendant Danny L. Gomez in an amount not less than One Hundred Fifty Three Thousand Dollars ($153,000), plus interest and costs, and that the claim of Defendant Danny L. Gomez be disallowed.

## COUNT VI

**FRAUDULENT TRANSFER**
**(Defendants George and Rebecca Gomez)**

79.     The allegations contained in paragraphs 1 through 78 are incorporated by reference as if more fully set forth herein.

80.     During the year prior to the Petition Date, the Debtors paid defendants George and Rebecca Gomez amounts totaling in excess of $75,000. Such sums were paid ostensibly as salary.

81.     During the year prior to the Petition Date, neither George Gomez nor Rebecca Gomez provided any substantial service to the Debtors.

82.     Such transfers were intended by the Debtors and defendants George Gomez and Rebecca Gomez to hinder, delay and defraud creditors of the Debtors.

83.      Such transfers were made at a time when the Debtors were insolvent, and were not in exchange for reasonably equivalent value.

84.     Defendants George Gomez and Rebecca Gomez were the initial transferees of such transfers, or were the persons for whose benefit such transfers were made.

85.     The transfers to defendants George and Rebecca Gomez are avoidable under Section 548, and recoverable under Section 550, of the Bankruptcy Code.

WHEREFORE, the Plan Administrator demands judgment against defendants George Gomez and Rebecca Gomez in an amount not less than Seventy Five Thousand Dollars ($75,000), plus interest and costs.

## COUNT VII

### FRAUDULENT TRANSFER
### (Defendants Angela and Quenton King)

86.     The allegations contained in paragraphs 1 through 85 are incorporated by reference as if more fully set forth herein.

87.     During the year prior to the Petition Date, the Debtors paid defendants Angela and Quenton King amounts totaling in excess of $81,000.  Such sums were paid ostensibly as salary.

88.     During the year prior to the Petition Date, neither Angela King nor Quenton King provided service to the Debtors of a value that was reasonably equivalent to the amounts paid to them.

89.     Such transfers were intended by the Debtors and defendants Angela King and Quenton King to hinder, delay and defraud creditors of the Debtors.

90.      Such transfers were made at a time when the Debtors were insolvent, and were not in exchange for reasonably equivalent value.

91.     Defendants Angela King and Quenton King were the initial transferees of such transfers, or were the persons for whose benefit such transfers were made.

92.     The transfers to defendants Angela King and Quenton King are avoidable under Section 548, and recoverable under Section 550, of the Bankruptcy Code.

WHEREFORE, the Plan Administrator demands judgment against defendants Angela King and Quenton King in an amount not less than Eighty One Thousand Dollars ($81,000), plus interest and costs.

## COUNT VIII

### FRAUDULENT TRANSFER
### (Defendant Donald Beaudoin)

93.    The allegations contained in paragraphs 1 through 92 are incorporated by reference as if more fully set forth herein.

94.    During the year prior to the Petition Date, the Debtors paid defendant Donald Beaudoin amounts totaling in excess of $80,000.  Such sums were paid ostensibly as salary.

95.    During the year prior to the Petition Date, defendant Donald Beaudoin did not provide service to the Debtors of a value that was reasonably equivalent to the amounts paid to him.

96.    Such transfers were intended by the Debtors and defendant Donald Beaudoin to hinder, delay and defraud creditors of the Debtors.

97.    Such transfers were made at a time when the Debtors were insolvent, and were not in exchange for reasonably equivalent value.

98.    Defendant Donald Beaudoin was the initial transferee of such transfers, or was the person for whose benefit such transfers were made.

99.    The transfers to defendant Donald Beaudoin are avoidable under Section 548, and recoverable under Section 550, of the Bankruptcy Code.

WHEREFORE, the Plan Administrator demands judgment against defendant Donald Beaudoin in an amount not less than Eighty Thousand Dollars ($80,000), plus interest and costs.

### COUNT IX

### [WITHDRAWN]

100.    [Paragraphs 100 through 106 are intentionally omitted.]

## COUNT X

### FRAUDULENT TRANSFER
### (Defendant Carole Nelson)

101.    The allegations contained in paragraphs 1 through 106 are incorporated by reference as if more fully set forth herein.

102.    During the year prior to the Petition Date, the Debtors paid defendant Carole Nelson amounts totaling in excess of $51,000.  Such sums were paid ostensibly as salary.

103.    During the year prior to the Petition Date, defendant Carole Nelson did not provide service to the Debtors of a value that was reasonably equivalent to the amounts paid to her.

104.    Such transfers were intended by the Debtors and defendant Carole Nelson to hinder, delay and defraud creditors of the Debtors.

105.     Such transfers were made at a time when the Debtors were insolvent, and were not in exchange for reasonably equivalent value.

106.    Defendant Carole Nelson was the initial transferee of such transfers, or was the person for whose benefit such transfers were made.

107.    The transfers to defendant Carole Nelson are avoidable under Section 548, and recoverable under Section 550, of the Bankruptcy Code.

WHEREFORE, the Plan Administrator demands judgment against defendant Carole Nelson in an amount not less than Fifty One Thousand Dollars ($51,000), plus interest and costs.

## COUNT XI

### NEGLIGENCE
### (Douglas Gomez, Carolyn Gomez, Dean Nelson and Carole Nelson)

108.   The allegations contained in paragraphs 1 through 107 are incorporated by reference as if more fully set forth herein.

109.   Defendants Douglas Gomez, Carolyn Gomez, Dean Nelson and Carole Nelson (the "Gomez/Nelson Defendants") owed a duty of care to the Debtors in the discharge of their duties as employees, officers, directors, and managers of the Debtors.  Without limiting the generality of the foregoing, the Gomez/Nelson Defendants, in the discharge of their duties, were required to exercise, for the benefit of the Debtors, the care that an ordinarily prudent person in a like position would use under similar circumstances.   As officers, directors and management of the Debtors, such defendants owed fiduciary duties of loyalty and care to the Debtors.

110.   The Gomez/Nelson Defendants knew, or with the exercise of reasonable diligence, should have known, that the Debtors could not satisfy their obligations to consumers on account of unfilled orders and unrefunded deposits.

111.   A prudent person under similar circumstances either would have desisted from accepting consumer deposits or would have segregated such funds to assure that the funds would be available to obtain furniture ordered by consumers and thus to fulfill orders and discharge the Debtors' obligations to its customers.

112.   The Gomez/Nelson Defendants affirmatively directed, encouraged and facilitated a campaign to collect consumer deposits at times when the Debtors were unable to fill orders. By directing, encouraging and facilitating the campaign to collect consumer deposits for orders that the Debtors could not fill, the Gomez/Nelson Defendants created liabilities for the Debtors to consumers in excess of $5,500,000.  These liabilities damaged the Debtors because the

incurring of such liabilities did not give rise to a corresponding benefit to the Debtors.  The funds

received by the Debtors from consumers whose orders could not be filled were used in part: to

pay unnecessary operating expenses; to pay the salaries of the Gomez/Nelson Defendants; to pay

supposed salaries to relatives of the Gomez/Nelson Defendants, even though certain relatives

provided no services whatsoever to the Debtors in exchange for such payments; to repay loans

allegedly owed by the Debtors to Douglas Gomez and Dean Nelson (in violation of then-existing

loan covenants); to pay consulting fees to Douglas Gomez's brother, Danny Gomez, even though

Danny Gomez did not provide consulting services to the Debtors.

113.    During the year prior to the Debtors' bankruptcy filings, the Gomez/Nelson

Defendants caused the Debtors to make substantial payments to Bank of America ("BofA")

under the then-existing loan agreement between the Debtors and BofA.  Defendant Douglas

Gomez personally guaranteed the Debtors' indebtedness to BofA.  The campaign to collect

consumer deposits facilitated payments to BofA.  Such payments directly and/or indirectly

benefitted Defendant Douglas Gomez by reducing his exposure to BofA and creating

opportunities for more favorable treatment from BofA in connection with his personal guaranty.

114.    In addition to creating unnecessary liabilities for the Debtors, the Gomez/Nelson

Defendants' campaign to collect consumer deposits imposed substantial administrative and legal

expenses on the Debtors.  The claims of thousands of consumers required the Debtors, the

Debtors' bankruptcy estate, and the Plan Administrator, to incur substantial staff salaries, rent on

facilities, legal fees and expenses, and other expenses, in order to address the consumer claims

and the legal issues arising on account of the existence of such claims.  But for the campaign by

the Gomez/Nelson Defendants to collect consumer deposits, such expenses would not have been

incurred by the Debtors, their bankruptcy estates or the Plan Administrator.

115.    The acts and omissions of the Gomez/Nelson Defendants actually and proximately caused the Debtors to suffer damages by rendering them liable to customers and other creditors in amounts not less than $5,500,000. All such losses and liabilities were the direct and proximate result of the negligence of Gomez/Nelson Defendants. The acts and omissions of the Gomez/Nelson Defendants further caused the Debtors to suffer damages in the form of the expenses, described above, that the Debtors incurred as a result of having to administer thousands of consumer claims.

WHEREFORE, the Plan Administrator demands judgment against defendants Douglas Gomez, Carolyn Gomez, Dean Nelson and Carole Nelson, jointly and severally, as compensatory damages in amounts to be determined at trial, plus interest and costs.

## COUNT XII

### GROSS NEGLIGENCE
**(Douglas Gomez, Carolyn Gomez, Dean Nelson, Carole Nelson)**

116.    The allegations contained in paragraphs 1 through 115 are incorporated by reference as if more fully set forth herein.

117.    As directors and officers of the Debtors, the Gomez/Nelson Defendants had the duty to use their best efforts to promote the interests of the Debtors. They further had the duty to desist from using their positions of control to advance their own individual interests in derogation of the interests of the Debtors. As fiduciaries for the Debtors, the Gomez/Nelson defendants owed the Debtors the duty of utmost care and loyalty.

118.    The Gomez/Nelson Defendants' actions and omissions with respect to the campaign to collect consumer deposits served their personal interests by providing funds for the payment of their own salaries, payments to relatives, some of whom did not provide any services to the Debtors, reduction of Defendant Douglas Gomez's personal exposure with respect to his

guaranty of the BofA loan, repayment of personal loans on the eve of bankruptcy and payments to Douglas Gomez's brother for consulting services that were not provided.

119.    The Gomez/Nelson Defendants breached their duties of loyalty to the Debtors by paying excessive salaries and benefits to themselves and to their family members, without regard to the damage caused to the Debtors.

120.    The actions and omissions of the Gomez/Nelson Defendants constituted intentional failures to perform manifest duties in reckless disregard of the consequences to property of the Debtors.  The Gomez/Nelson Defendants acted with utter indifference to the rights of the Debtors, as though such rights did not exist.

121.    The actions and omissions of the Gomez/Nelson Defendants actually and proximately caused damage to the Debtors.

WHEREFORE, the Plan Administrator demands judgment against defendants Douglas Gomez, Carolyn Gomez, Dean Nelson and Carole Nelson, jointly and severally, as compensatory damages in amounts to be determined at trial, plus interest and costs.

Dated: September 22, 2008

PLATZER, SWERGOLD, KARLIN, LEVINE, GOLDBERG & JASLOW, LLP

*/s/ Sydney G. Platzer*
Sydney G. Platzer, Esq.
Andrew S. Muller, Esq.
1065 Avenue of The Americas,18 th Fl.
New York, New York 10018
Telephone: (212) 593-3000
Facsimile: (212) 593-0353

*Counsel for the Plan Administrator*


LINOWES AND BLOCHER LLP

*/s/ Bradford F. Englander*
Bradford F. Englander, Federal Bar No. 11951
7200 Wisconsin Avenue, Suite 800
Bethesda, Maryland 20814
Telephone: (301) 961-5125
Facsimile: (301) 654-2801
Benglander@linowes-law.com

*Plan Administrator*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September, 2008, I caused copies of the First Amended Complaint to be served via first class United States mail, postage prepaid on the following parties:

Alan D. Eisler
Meyers, Eisler & Leatham, LLC
11140 Rockville Pike
Suite 570
Rockville, MD 20852
Email: aeisler@meyerseisler.com

Lawrence P Block
Stinson Morrison Hecker
1150 18th St., NW, Ste. 800
Washington, DC 20036
Email: lblock@stinson.com

Richard H. Gins
The Law Office of Richard H. Gins, LLC
3 Bethesda Metro Center
Suite 530
Bethesda, MD 20814
Email: richard@ginslaw.com

/s/ Bradford F. Englander
Bradford F. Englander

L&B 1061476v2/10745.0001

# EXHIBIT A

EMPLOYMENT TERMINATION AND CONSULTING AGREEMENT

THIS EMPLOYMENT TERMINATION AND CONSULTING AGREEMENT
("Agreement") is made and entered into this _____ day of February, 2004, by and between
Mastercraft Interiors, Ltd. (Mastercraft), a corporation organized and existing under the laws of the
State of Maryland, with its principal place of business at 6800 Distribution Drive, Beltsville,
Maryland 20705 and Danny L. Gomez (Consultant), an individual residing at 18700 Shremor
Drive, Derwood, Maryland 20855.

WHEREAS, Consultant has been employed by Mastercraft as an executive officer and
has served as a member of its Board of Directors, since 1977, and during his tenure Consultant
has made substantial contributions to the growth and success of Mastercraft; and

WHEREAS, Consultant has decided to retire from full-time employment with Mastercraft;
but, nevertheless, expects to engage in other gainful employment and business enterprises on at
least a part time basis for the foreseeable future; and

WHEREAS, Consultant's many years as an executive and director of Mastercraft and his
expertise and knowledge gained from his experience in the furniture industry in general, and with
respect to the corporate interests of Mastercraft in particular, represent an irreplaceable and valuable
resource to Mastercraft; and

WHEREAS, Mastercraft desires to continue to utilize Consultant's experience, expertise
and knowledge and by this Agreement seeks to insure that the services of Consultant will be
available to Mastercraft throughout the term of this Agreement;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants
herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    RESIGNATION; ASSET TRANSFERS AND LOAN REPAYMENT
      Consultant hereby confirms his resignation as an executive officer, director and employee
of Mastercraft, and Mastercraft hereby accepts such resignation, effective as of the close of
business on February 20, 2004 (the "Termination Date"). All Mastercraft medical, life insurance
and other benefits shall terminate as of the Termination Date and Consultant shall not be entitled
to any benefits thereafter, except as otherwise expressly provided in this Agreement.

In addition, on or before the Termination Date, Consultant shall perform all of the
following:

      A.           Consultant shall purchase from Mastercraft, and Mastercraft will assign
and transfer to Consultant, all of Mastercraft's right, title and interest in and to all Mastercraft
inventory in the possession of Consultant as of the Termination Date. For purposes of this
Agreement, the parties value all such inventory at, and Consultant shall pay to Mastercraft, Sixty-
Nine Thousand Dollars ($69,000.00).

B.              Consultant shall purchase, and Mastercraft will assign and transfer all of its right, title, and interest in and to, the 2002 Ford Explorer Limited automobile presently being used by Consultant, free and clear of liens. All transfer taxes and other fees charged in connection with transfer of the title to the automobile shall be paid by Mastercraft. Mastercraft and Consultant agree to execute all necessary documents and to take all necessary steps to effect the transfer of title of the automobile to Consultant.   For purposes of this Agreement, the parties value the transfer of the automobile at, and Consultant shall pay to Mastercraft, Nineteen Thousand Dollars ($19,000.00).

C.              Consultant shall additionally repay to Mastercraft the amount presently owed by Consultant to Mastercraft, which the parties hereby agree is One Hundred Four Thousand Dollars ($104,000.00).  Upon such repayment, Mastercraft will irrevocably discharge and release Consultant from all debts that Consultant owes to Mastercraft and all promissory notes, agreements, and other evidence of debt owed by Consultant to Mastercraft will be surrendered by Mastercraft to Consultant marked "paid and cancelled."  The parties agree that notwithstanding any other agreements, promises, promissory notes, or other indicia of indebtedness to the contrary, Consultant is indebted to Mastercraft in the full amount of One Hundred Four Thousand Dollars ($104,000.00) and that the entire amount of such indebtedness shall be discharged by the repayment thereof, as provided above.

2.     RELEASE OF GUARANTEE

Consultant, as a shareholder and executive officer of Mastercraft has executed one or more instruments guaranteeing payment of obligations incurred or to be incurred by Mastercraft. The parties agree that in light of Consultant's resignation from Mastercraft, it is no longer appropriate for Consultant to continue as a guarantor of Mastercraft obligations.  Accordingly, the parties agree that on or before the Termination Date, Mastercraft will obtain a release of Consultant from all personal guarantees given by him guaranteeing in any manner the payment or collection of obligations of Mastercraft.

3.     CONSULTING SERVICES

Subject to the terms and conditions set forth herein, Mastercraft engages Consultant to provide advice and consulting services to Mastercraft with respect to the internal administration of Mastercraft, finance, purchasing, marketing and other general business administration issues of the same nature as those dealt with by Consultant during the time that he served as an executive officer of Mastercraft including, but not limited to, the following services:

a.     consultation regarding employment matters pertaining to Mastercraft;

b.     consultation regarding employment disputes with employees and former employees of Mastercraft, including participation as a witness at legal proceedings involving current and former employees of Mastercraft;

c.     analyses regarding market trends affecting the furniture industry;

d.     advice and consultation regarding relationships and contractual arrangements with vendors; and

e.     advice and consultation regarding sites for new retail operations, including analysis regarding the desirability of prospective new store locations.

2

During the term of this Agreement, Consultant shall make himself available to Mastercraft to provide the foregoing consulting services at times reasonably convenient to both parties, but not to exceed twenty (20) hours in any given week, and not to exceed a cumulative total of eight hundred (800) hours in any given calendar year. Any hours actually worked in excess of twenty (20) hours per week shall be credited to Consultant's obligations for the next succeeding week. The Consultant may perform the consulting services from such location(s) as the Consultant shall reasonably determine appropriate; it being agreed, however, that where the nature of such services requires Consultant's presence (e.g., the Consultant is serving as a witness at a legal proceeding), Consultant shall be present as required by Mastercraft to perform such service. The manner in which such services are performed shall be determined by Consultant. Mastercraft will rely on Consultant to devote such time as may be reasonably necessary, within the limitations set forth above, to fulfill Consultant's obligations under this Agreement. Consultant shall maintain records regarding the services performed hereunder, and shall provide such records to Mastercraft upon Mastercraft's request from time to time. Such records shall be presumed correct absent manifest error. Consultant shall report to, receive his direction from, and be responsible to, the Chief Executive Officer of Mastercraft, personally, and no other person.

4.   INDEPENDENT CONTRACTOR STATUS

In all matters relating to this Agreement, Consultant shall be acting as an independent contractor and shall report all compensation hereunder as self-employment income. Consultant shall not be considered an employee of Mastercraft under the meaning or application of any Federal or State Unemployment or Insurance Laws or Workmen's Compensation Laws, or otherwise. Consultant acknowledges that he is solely responsible for the payment of all taxes arising out of the payment of compensation to him by Mastercraft. Mastercraft shall not withhold any amounts from the fees payable to Consultant under this Agreement, for any reason.

5.   TERM AND TERMINATION.

The term of the consulting engagement under this Agreement ("Term") shall commence on February 21, 2004, and shall terminate on the first to occur of the following events: (i) February 20, 2014; (ii) a "change of control" as hereinafter defined; or (iii) the death of Consultant. For purposes of this Section 5, a "change of control" shall mean the occurrence, after the date of this Agreement, of any one of the following events, directly or indirectly or in one or more series of transactions:

(a)   Douglas Gomez is no longer the Chief Executive Officer of Mastercraft;

(b)   A consolidation or merger of Mastercraft with any third party (which includes a single person or entity or a group of persons or entities acting in concert) not wholly owned directly or indirectly by Mastercraft (a "Third Party"), unless Mastercraft is the entity surviving such merger or consolidation;

(c)   A transfer of all or substantially all of the assets of Mastercraft to a Third Party or a complete liquidation or dissolution of Mastercraft; or

3

    (d)    A Third Party, directly or indirectly, through one or more subsidiaries or transactions or acting in concert with one or more persons or entities:

    i.    acquires beneficial ownership of more than 50% of the classes of stock of Mastercraft entitled to vote generally in the election of directors ("Voting Stock");

    ii.    acquires irrevocable proxies representing more than 50% of the Voting Stock;

    iii.    acquires any combination of beneficial ownership of Voting Stock and irrevocable proxies representing more than 50% of the Voting Stock; or

    iv.    acquires the ability to directly or indirectly exercise a controlling influence over the management or policies of Mastercraft.

6.    COMPENSATION TO CONSULTANT

Annual Fee

Mastercraft shall pay Consultant a fee of One Hundred Fifty-Three Thousand Two Hundred and Fourteen Dollars ($153,214.00) per year during each year of the Term. The annual fee shall be payable in installments. The amount of each such installment shall be equal to the full amount of the annual fee divided by the number of pay periods over which Mastercraft pays its employees in a given year. Each installment payment shall be made to Consultant on the same day as Mastercraft issues payment to its clerical and management employees under its ordinary payroll practices (such dates being hereinafter referred to as "Pay Days"). The first installment payment in a given year shall be made on Mastercraft's first Pay Day in that year, regardless of the number of days that may have elapsed from the beginning of the calendar year to the first Pay Day (except that such payment shall be prorated, as appropriate, so that the payments hereunder do not exceed One Hundred Fifty-Three Thousand Two Hundred and Fourteen Dollars ($153,214.00) per year during each year of the Term). Consultant shall not be required to provide invoices or any other documentation to Mastercraft as a precondition of payment. In the absence of a final determination of the rights and liabilities of the parties, as hereinafter provided, Mastercraft will not deduct or set-off any claimed amounts from or against any installment provided for in this Agreement, whether based upon claims arising under this Agreement or otherwise. Consultant expects that he may be required to decline other employment and business opportunities in order to make himself available to Mastercraft for the performance of the services contemplated by this Agreement. For that reason and in further consideration of Consultant's commitment to make himself available for the services to be provided under this Agreement, and to keep his knowledge and expertise in the furniture industry current, during the Term, the parties expressly agree that the compensation provided under this Agreement and the Term are essential terms and may not be reduced by Mastercraft, for any reason, without the express written consent of Consultant.

4

In the event of a change of control of Mastercraft (as defined above), Mastercraft shall pay Consultant, within ninety (90) days of the change of control, a lump sum payment equal to the sum of the aggregate amount of the annual fee payments Consultant would have received had this Agreement not been terminated prior to December 31, 2013, discounted to present value at a discount rate equal to one percent (1%) above the per annum one-year Treasury Bill rate, as published in the Eastern Edition of the Wall Street Journal, on effective date of the change of control (or the next preceding date on which such rate is published), applied to each installment payment that otherwise would have been due under this Agreement, from the time it would have become payable to the date Consultant receives payment.

7.    DEFAULT.

Mastercraft agrees that if it fails to pay any compensation due under this Agreement when due, such unpaid compensation shall bear interest, from the due date to the date of payment, at the rate of one percent (1%) per month, calculated on a daily basis. In the event that Mastercraft fails to cure any monetary default under this Agreement within ninety (90) days of notice of such default, the entire unpaid amount of the annual fee, calculated through February 20, 2014, shall become immediately due and payable, at the option of Consultant. A default shall not be deemed cured unless and until all amounts then due and payable to the Consultant, including those that have accrued since the date of default, have been paid in full. Notwithstanding the foregoing cure provision, there shall be no right to cure a monetary default if there have been more than two monetary defaults within the immediately preceding twelve month period.

8.    DISPUTE RESOLUTION

Consultant and Mastercraft agree that any future dispute between them over the application or interpretation of this Agreement shall be resolved under the following procedures:

(a)    The party claiming to be aggrieved shall furnish to the other a written statement of the grievance, the persons whose testimony would support the grievance, and the relief requested or proposed.

(b)    If the other party does not agree to furnish the relief requested or proposed, or otherwise does not satisfy the demand of the party claiming to be aggrieved within thirty (30) days after receipt of the aggrieved party's written statement, then the parties shall submit the dispute to non-binding mediation before a mediator jointly selected and paid for by the parties.

(c)    If the mediation does not produce a resolution of the dispute within sixty (60) days of the selection of the mediator, the parties agree to submit the dispute to the American Arbitration Association ("AAA"). A single arbitrator selected by the parties shall conduct the arbitration. If the parties are unable to agree on an arbitrator, then the AAA shall appoint a single arbitrator in accordance with its rules. In any such arbitration proceeding, any hearing must be transcribed by a certified court reporter and any decision must be consistent with the law of the State of Maryland and supported by findings of fact and conclusions of law. The arbitrator shall have no authority to add to, modify, change or disregard any lawful terms of this Agreement; or

5

to issue an award that is contrary to the law of the State of Maryland. In addition, the arbitrator shall have no authority to award punitive or exemplary damages and the parties expressly waive their rights to any such damages. The prevailing party in any such controversy or claim shall be entitled to recover reasonable attorneys' fees based on the number of hours worked at a reasonable hourly rate, without any premium or multiplier. The award may be confirmed and enforced in any court of competent jurisdiction. Arbitration shall be the exclusive final remedy for any dispute between the parties arising under this Agreement. Notwithstanding any other provision herein to the contrary, the payments provided for Consultant under this Agreement shall not be suspended for any reason pending resolution of any dispute hereunder.

9.    NON-ASSIGNMENT

This Agreement may not be transferred or assigned by either party without the prior written consent of the other party.

10.    RELEASE AND WAIVER OF CLAIMS

Mastercraft and Consultant, for themselves, their respective heirs, relatives, successors and assigns and members, employees, officers, agents, legal representatives, partners, limited partners, affiliates, predecessors, successors, insurers, subsidiary and sibling corporations and entities, and assigns, hereby generally, voluntarily and knowingly, absolutely, irrevocably, and unconditionally remise, mutually release, quit-claim and forever discharge one another, each of them and all other persons, parties, entities, corporations, partnerships, legal representatives, partners, limited partners, affiliates, predecessors, successors, insurers, subsidiary and sibling corporations and entities, and assigns, of and from any and all suits, claims, demands, obligations, rights, costs, losses, controversies, debts, sums of money, actions and causes of actions of whatsoever kind or nature, whether known or unknown, which they or any of them has or may hereafter have against any of them arising out of, relating to, or in connection with Mastercraft's employment of Consultant at any time up to and including the Termination Date. This release shall not limit or restrict the parties' rights to seek enforcement of this Agreement.

11.    ENTIRE AGREEMENT, AMENDMENT, SEVERABILITY

This Agreement contains the entire understanding between the parties with respect to all rights and obligations arising out of the employment of Consultant by Mastercraft and the engagement of Consultant as a consultant to Mastercraft. This Agreement may be terminated, amended, modified, or supplemented only by a written instrument executed by Consultant and Mastercraft. If, for any reason, any provision of this Agreement is held invalid, such invalidity shall not affect any other provision of this Agreement not held so invalid, and each such other provision shall, to the full extent consistent with law, continue in full force and effect. If any provision of this Agreement shall be held invalid in part, such invalidity shall in no way affect the rest of such provisions not held so invalid, and the rest of such provision, together with all other provisions of this Agreement, shall to the full extent consistent with law continue in full force and effect.

6

Case 8:06-cv-02424-DoC-1 Doc #: 362-1 Filed 05/22/2008 Page 8 of 8
Case 8:09-cv-00021-AW Document 1-3 Filed 01/06/09 Page 57 of 57
Case: 06-12769    Doc #: 424-5    Filed: 01/17/2007    Page 5 of 10

other provisions of this Agreement, shall to the full extent consistent with law continue in full force and effect.

12.    NOTICES

All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by certified mail, return receipt requested, first-class postage prepaid, to the parties to this Agreement at their respective addresses set forth at the beginning of this Agreement, or to such other address as either party to this Agreement shall have last designated by notice to the other party. All such notices and communications shall be deemed to have been received on the earlier of the date of receipt or the third business day after the date of mailing thereof.

13.    BINDING EFFECT

This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended or shall be construed to give any person, other than the parties to this Agreement or their respective successors or permitted assigns, any legal or equitable right, remedy, or claim under or in respect of any agreement or any provision contained herein.

14.    ATTORNEY'S FEES.

On the effective date of this Agreement, Mastercraft shall pay Consultant the sum of Five Thousand Dollars ($5,000.00) as reimbursement for his attorney's fees incurred in the negotiation and preparation of this Agreement.

IN WITNESS WHEREOF, Mastercraft has caused this Agreement to be executed and its seal to be affixed hereunto by its duly authorized officer, and Consultant has signed this Agreement, under seal, each as of the respective dates appearing below.

ATTEST:                                    MASTERCRAFT INTERIORS, LTD.

_____                    By: _____
                                           Name: _____
(Corporate Seal)                           Title: _____
                                           Date: 2/19/04

WITNESS:                                    CONSULTANT

_____                    _____ (SEAL)
                                           DANNY L. GOMEZ

7